UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SELWYN KARP, Individually and on Behalf of All Others Similarly Situated,<br><br>                                    Plaintiff,<br><br>        vs.<br><br>FEDEX CORPORATION, FREDERICK W. SMITH, ALAN B. GRAF, JR., DAVID J. BRONCZEK, RAJESH SUBRAMANIAM, DAVID L. CUNNINGHAM, DONALD F. COLLERAN, and MICHAEL C. LENZ,<br><br>                                    Defendants. | Case No.<br><br>CLASS ACTION<br><br>COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS<br><br>DEMAND FOR JURY TRIAL |

Plaintiff Selwyn Karp ("Plaintiff"), individually and on behalf of all others similarly situated, alleges the following based on personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based upon the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by FedEx Corporation ("FedEx" or the "Company"), as well as conference call transcripts, media and analyst reports about the Company. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities fraud class action on behalf of all those who purchased, or otherwise acquired, FedEx securities during the period from September 19, 2017 through December 18, 2018, inclusive (the "Class Period"), who were damaged thereby (the "Class"),

seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder.

2.      FedEx is a global logistics company that ships goods to commercial and residential customers throughout the world.  Traditionally, FedEx has generated a substantial majority of its revenues in the United States.  During its fiscal year 2016,[1] FedEx generated 76% of its revenues in the United States and 24% of its revenues in international markets.

3.      In July 2016, FedEx significantly expanded its international operations through its $4.8 billion acquisition of TNT Express N.V. ("TNT"), a Netherlands-based logistics company with operations concentrated in Europe.  To date, this has been the largest acquisition in FedEx history.  This acquisition instantly added billions of dollars of European revenues to FedEx's topline and increased the Company's international revenue mix from 24% in fiscal year 2016 to 33% in fiscal year 2017.

4.      After the acquisition closed, FedEx embarked on an aggressive strategy to integrate its legacy European operations with TNT.  On March 31, 2017, nine months after completing the acquisition, FedEx issued a three-year operating income improvement target for investors to gauge and track the purported benefits of the TNT acquisition and FedEx's integration efforts.  Specifically, the Company stated that, in fiscal year 2020, its integration with TNT would result in a $1.2 billion to $1.5 billion operating income improvement above its fiscal year 2017 reported operating income (the "TNT Income Improvement Target").

5.      On June 27, 2017, however, TNT's operations were crippled by a cyberattack known as NotPetya, which involved the spread of a malware virus throughout TNT's systems (the "Cyberattack").  NotPetya is considered one of the largest cyberattacks in history, having

---

[1]  The Company's fiscal year ends on May 31.  For example, FedEx's fiscal year 2016 ended on May 31, 2016.

affected a multitude of companies on a global scale.  The timing of the attack was particularly problematic for FedEx, as TNT's systems were paralyzed during the critical period involving the integration of TNT with the Company's legacy European operations.

6.      The Class Period starts on September 19, 2017, when FedEx reported that the Cyberattack had negatively impacted its first quarter 2018 results (ended August 30, 2017). During the related earnings call, however, Defendants assured investors that ***all critical*** TNT systems were fully restored and fixes to its customer-specific systems were expected to be finalized by the end of September 2017.  Company executives also reaffirmed the TNT Income Improvement Target.  Analysts maintained their ratings and price targets on FedEx stock due to the Company's assurances about its recovery from the Cyberattack.  On this news, FedEx stock increased $4.50 per share, or roughly 2.1%, to close at $220.50 per share on September 20, 2017.

7.      Throughout the Class Period, Defendants continually assured investors about its recovery from the Cyberattack and that any negative impact from the attack was minimal.  For example, Defendants told investors that TNT customer volumes were being restored to pre-attack levels and that "despite the cyberattack, the customers stuck with us."  Defendants also stated that TNT integration efforts were successfully progressing and continuously stated that FedEx was "on track" to achieve the TNT Income Improvement Target.

8.      Notwithstanding these positive representations to the market, Defendants made false and misleading statements and/or failed to disclose that:  (i) TNT's overall package volume growth was slowing as TNT's large customers permanently took their business to competitors after the Cyberattack; (ii) as a result of the customer attrition, TNT was experiencing an increased shift in product mix from higher-margin parcel services to lower-margin freight services; (iii) the anticipated costs and timeframe to integrate and restore the TNT network were

significantly larger and longer than disclosed; (iv) FedEx was not on track to achieve the TNT Income Improvement Target; and (v) as a result of these undisclosed negative trends and cost issues, FedEx's positive statements about TNT's recovery from the Cyberattack, integration into FedEx's legacy operations, customer mix, customer service levels, profitability, and prospects lacked a reasonable basis.

9.     The truth about TNT's deteriorating business was revealed through a series of disclosures. While making these disclosures, however, Defendants continued to assure investors that FedEx would still meet the TNT Income Improvement Target, and that TNT had successfully recovered in the wake of the Cyberattack.

10.     On June 19, 2018, FedEx provided a disappointing capital expenditure outlook for its FedEx Express segment, the reporting segment that includes TNT's results, and reported higher-than-expected TNT integration expenses. On this news, FedEx shares dropped $6.96 per share, or 2.69%, to close at $251.43 per share on June 20, 2018. Despite these issues, Defendants assured investors that the Company was "on track" to meet the TNT Income Improvement Target, and that TNT's year-over-year growth had resumed.

11.     On September 17, 2018, FedEx reported lower-than-expected earnings for its first quarter ended August 30, 2018. The Company partially attributed these results to higher-than-expected TNT integration costs. On this news, FedEx stock dropped $14.15 per share, or 5.5%, to close at $241.58 per share on September 18, 2018. Defendants, however, again assured investors that the Company was on track to meet the TNT Income Improvement Target, and touted that the Company's "strong international volume growth reflect[ed] [FedEx's] recovery from the TNT cyberattack."

12.     On December 7, 2018, FedEx announced that David L. Cunningham would retire as FedEx Express' President and Chief Executive Officer ("CEO") on December 31, 2018. Analysts immediately suggested that Cunningham's "retirement" was a result of performance issues within the Company's FedEx Express segment.  On this news, FedEx stock dropped $13.67 per share, or roughly 6.4%, to close at $201.39 per share on December 7, 2018.

13.     The full extent of TNT's deteriorating business was revealed to investors on December 18, 2018 after the close of trading.  On that date, FedEx reported a large profit miss for its second fiscal quarter ended November 30, 2018.  Defendants attributed the disappointing results to lower package volumes in Europe and a negative shift in TNT's product mix to lower margin freight business following the Cyberattack, which had occurred well-over a year ago. The Company also lowered its fiscal 2019 earnings guidance and announced that the TNT Income Improvement Target would no longer be achievable by fiscal year 2020.  On this news, FedEx stock dropped $22.50 per share, or roughly 12.2%, to close at $162.51 per share on December 19, 2018.

14.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

15.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

16.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).  Substantial acts in furtherance of the alleged fraud or

the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the preparation and/or dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.  FedEx transacts business in this District, and the Company's stock trades on the New York Stock Exchange ("NYSE"), located within this District.

17.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

18.     Plaintiff, as set forth in the accompanying Certification, which is incorporated by reference herein, purchased FedEx securities during the Class Period and has been damaged thereby.

19.     Defendant FedEx, a global logistics company, is headquartered in Memphis, Tennessee, with principal executive offices located at 942 South Shady Grove Road, Memphis, Tennessee 38120.  The Company's stock is listed on the NYSE under the ticker symbol "FDX." As of March 15, 2019, there were 260,574,612 outstanding shares of FedEx common stock.

20.     Defendant Frederick W. Smith ("Smith") was at all relevant times the Company's Chairman and CEO during the Class Period.

21.     Defendant Alan B. Graf, Jr. ("Graf") was at all relevant times the Company's Chief Financial Officer ("CFO") and Executive Vice President during the Class Period.

22.     Defendant David J. Bronczek ("Bronczek") was at all relevant times the Company's Chief Operating Officer ("COO") and President during the Class Period.

23.     Defendant Rajesh Subramaniam ("Subramaniam") was at all relevant times the Company's Chief Marketing and Communications Officer and Executive Vice President during the Class Period.

24.     Defendant David L. Cunningham ("Cunningham") was at all relevant times President and CEO of FedEx Express during the Class Period.

25.     Defendant Donald F. Colleran ("Colleran") was at all relevant times the Company's Chief Sales Officer and Executive Vice President during the Class Period.

26.     Defendant Michael C. Lenz ("Lenz") was at all relevant times the Company's Treasurer and Corporate Vice President during the Class Period.

27.     Defendants Smith, Graf, Bronczek, Subramaniam, Cunningham, Colleran and Lenz are referred to herein as the "Individual Defendants."  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of FedEx's reports to the SEC, press releases, and presentations to securities analysts, money portfolio managers and institutional investors, *i.e.*, the market.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

28.     FedEx and the Individual Defendants are referred to herein, collectively, as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

29.     FedEx is a global logistics company that provides a broad portfolio of transportation, e-commerce, and business services.  Through its fleets of airplanes and trucks, FedEx ships goods to commercial and residential customers throughout the world.  The Company offers its customers with a variety of shipping services, including express freight, which tends to generate lower margins for FedEx than its ground delivery services.  The Company has four principal operating segments:  (i) FedEx Express; (ii) FedEx Freight; (iii) FedEx Ground; and (iv) FedEx Services.

30.     Since its inception in 1971, FedEx's largest geographic market has been the United States.  FedEx reported $50.4 billion in total revenues for its fiscal year 2016.  The Company generated $38.1 billion, or 76%, of its overall fiscal 2016 revenues in the United States and $12.3 billion, or 24%, of its overall fiscal 2016 revenues outside of the United States.

31.     FedEx's chief competitor in the United States is United Parcel Service, Inc. ("UPS"), an Atlanta, Georgia-based logistics company.  Outside of the United. States, FedEx principally competes against UPS and DHL International GmbH ("DHL"), a German-based logistics company with a significant European presence.  To expand internationally, and to better compete against UPS and DHL in Europe, FedEx acquired TNT for $4.8 billion in 2016.  TNT is a Netherlands-based shipping company that primarily operates in Europe.

32.     FedEx's agreement to acquire TNT was first announced by the Company on April 7, 2015.  On the same day, FedEx hosted a call with analysts and investors to discuss the benefits of this proposed acquisition.  During the call, Defendant Smith touted the Company's legacy

operations in Europe and its purported synergies with TNT's European business. The deal officially closed on July 4, 2016, after approvals from multiple regulatory bodies and TNT shareholders. To date, this has been FedEx's largest acquisition. The TNT acquisition substantially increased the size of FedEx's European business and the Company's international business mix.[2]

33.     After the acquisition was completed, FedEx embarked on an aggressive strategy to integrate its legacy European operations with TNT. On March 31, 2017, the Company updated the market on the integration of TNT, announcing that TNT's financial results would be combined with its FedEx Express reporting segment, and therefore, no longer transparent to investors on a standalone basis. Based on this reporting change, FedEx set the TNT Income Improvement Target, a measure of FedEx Express' operating income improvement over a three year period attributable to the synergies achieved between TNT and FedEx's legacy European operations. Specifically, FedEx targeted an operating income improvement at the FedEx Express segment of between $1.2 billion and $1.5 billion in fiscal year 2020, over the segment's reported fiscal year 2017 operating income of $2.8 billion. In other words, if FedEx successfully met the TNT Income Improvement Target, the Company's target operating income at the FedEx Express segment would reach between approximately $4.0 billion and $4.3 billion in fiscal 2020.

34.     On June 27, 2017, nearly a year after FedEx owned and operated TNT, various news outlets reported that TNT's computer systems were experiencing outages due to a potential cyberattack. Later that day, a FedEx spokesperson confirmed that there had been outside interference with some of TNT's systems and that the Company was taking steps to remedy the situation. Then, on June 28, 2017, FedEx reported that its TNT operations and communication

---

[2]   FedEx's fiscal year 2016 international revenues, which did not include TNT, were $12.3 billion. The Company's fiscal year 2017 international revenues, which included 11 months of TNT results, were $20.1 billion.

networks had been significantly disrupted by the Cyberattack, which involved the spread of a malware virus into TNT's information systems. FedEx stated that the Cyberattack had slowed down its TNT information systems which caused customer service delays. The Company further reported that it was going to quickly implement a remediation process and that the resulting financial impact could be material.

35.     Later on June 28, 2017, news outlets reported that the Cyberattack had negatively impacted the information systems of other global companies.[3] News sources also reported that several organizations within the Ukraine had been affected by the Cyberattack. The Cyberattack is considered one of the most devastating attacks in history with a total estimated financial harm of more than $10 billion on corporations and other entities.[4]

36.     As one of the victims of the Cyberattack, TNT's operations were immediately crippled and, unknown to investors, the Cyberattack continued to negatively impact the Company throughout the Class Period. Specifically, TNT package deliveries to customers experienced significant delays and/or were lost throughout Europe. Because of these issues, a significant amount of TNT's customers permanently moved the Company's high-margin parcel business to UPS and DHL. Throughout the Class Period, TNT was unable to recover this lost business.

_____

[3] On June 28, 2017, Bloomberg reported that, in addition to TNT, a global cyberattack had negatively impacted information systems at various companies including: (i) Mondelez International Inc., a food and beverage company based in the United States; (ii) DLA Piper, an Andy international law firm based in the United States; (iii) Maersk Line A/S, a marine transportation company based in Denmark; and (iv) BNP Paribas SA, a global bank based in France.

[4] Andy Greenberg, The Untold Story of NotPetya, *The Most Devastating Cyberattack in History,* Wired (Aug. 22, 2018, 05:00 AM), https://www.wired.com/story/notpetya-cyberattack-ulcraine-russia-code-crashed-the-world/

## MATERIALLY FALSE AND MISLEADING
## STATEMENTS ISSUED DURING THE CLASS PERIOD

37.     The Class Period starts on September 19, 2017, when FedEx reported its first quarter 2018 results (ended August 30, 2017).  The Company's quarterly revenues and earnings missed analysts' estimates due to lost customer sales and remedial costs from the Cyberattack. Despite this near-term pressure at TNT, Defendants highlighted its recovery efforts from the Cyberattack and downplayed the lingering impacts on its business.

38.     For example, during the related earnings call on September 19, 2017, Defendants assured investors that ***all critical*** TNT systems were fully restored and fixes to its customer-specific systems were expected to be finalized by the end of September 2017.   Company Executives also reaffirmed the TNT Income Improvement Target, stating in pertinent part: "***We're confident of our prospects for long-term profitable growth, and we reaffirm our commitment to improve operating income at FedEx Express segment by $1.2 billion to $1.5 billion in fiscal 2020 versus fiscal 2017.***   Our overall goals remain to increase earnings, cash flows, returns, and margins."[5]

39.     During the same call, Defendant Bronczek assured investors that all critical TNT systems were fully restored to "pre-crisis levels," and that fixes to customer-specific solutions were expected to be finalized and restored by the end of September 2017 "just in time for peak shipping," stating in pertinent part:

> Given the discussion around the impact of the cyberattack on TNT, I thought it [was] very important to point out the underlying fundamentals of the FedEx Express business remain very strong.
>
> In particular, International Export Package revenue for the segment grew 4% in the quarter after absorbing the impact of the cyberattack. And we have made significant progress on the recovery of the TNT business and IT systems.

---

[5] Emphasis added throughout, unless otherwise noted.

\* \* \*

From a customer perspective, our teams are executing a detailed, thorough, and customer-focused plan, targeting and restoring customer volumes to our expected levels. This plan includes leveraging our senior officer team on sales calls to instill confidence with customers so that we can fully meet their expectations . . . .

***Our service levels within Europe have been restored to pre-crisis levels.*** And in August, this past month of 2017, our service levels were actually above those a year ago in August of 2016. Tremendous work by the operations team.

With strong service levels and operations returning to near-normal capabilities, our focus now shifts to finalizing the restoration of certain key customer-specific solutions and their systems. ***We expect these IT capabilities to be restored by the end of this month, enabling business-as-usual operations with full capabilities across all customer segments just in time for peak shipping.***

40.     Analysts took a positive view from these representations.  For example, Deutsche Bank maintained its "Buy" rating and $235.00 price target on the Company's stock, noting that the unchanged TNT Income Improvement Target was critical to the outlook for FedEx shares. Likewise, Oppenheimer maintained an "Outperform" rating and its $229.00 price target on FedEx stock on the purported recovery of TNT systems and the reiterated TNT Income Improvement Target.

41.     On this news, FedEx stock increased $4.50 per share, or roughly 2.1%, to close at $220.50 per share on September 20, 2017.

42.     On December 19, 2017, FedEx reported positive results for its second fiscal quarter ended November 30, 2017.   During FedEx's second quarter 2018 earnings call, Defendant Smith touted TNT's successful recovery from the Cyberattack, and stated the Company was "on target" to achieve the TNT Income Improvement Target, stating in pertinent part:

***We're very proud of the progress the FedEx team has made in recovering from the effects of the cyberattack at TNT.*** Let me express our appreciation to the thousands of FedEx professionals who worked around the clock and tirelessly to mitigate this

unprecedented event. Dave will update you in his discussion of overall global operations. We expect yield and volume growth at all of our transportation segments will support revenue and earnings growth in the second half of fiscal 2018. ***Our plans remain on target to improve operating income at the FedEx Express segment by $1.2 billion to $1.5 billion in fiscal 2020 versus fiscal 2017*** and our goal remains to increase earnings, margins, cash flows and returns and we are confident that we can do so.

43.     On the same call, Defendant Graf also stated that FedEx's international volumes had increased despite the Cyberattack, and also reaffirmed the TNT Income Improvement Target, stating in pertinent part:

> ***Despite the challenges from the cyberattack, total international average package volume increased 5%*** . . . ***We remain committed to our target of $1.2 billion to $1.5 billion in additional operating profit for the FedEx segment in FY 2020 versus FY 2017***, which includes TNT synergies as well as base business and other operational improvements across the entire global FedEx Express network.

44.     Likewise, Defendant Bronczek touted that TNT's service levels and operations were "back to normal," and that TNT's volumes and cost efficiencies were improving, stating in pertinent part:

> First, let me start off with FedEx Express. They grew their revenues and profits, as Alan just mentioned, despite the impact of the TNT Express cyberattack. ***The underlying fundamentals of the business remain very strong with higher base rates and growth in the international package and freight services. Cost efficiencies are also improving.*** For example, we continue to see higher aircraft fleet reliability, which increases our productivity. ***I'm also very happy to say that at TNT, we are seeing strong service levels and operations are back to normal after the June cyberattack.***

45.     On this news, FedEx stock increased $8.53 per share, or 3.5%, to close at $251.07 per share on December 20, 2017.

46.     On March 20, 2018, FedEx reported positive results for its third fiscal quarter ended February 28, 2018.  In addition, the Company raised its fiscal 2019 earnings forecast. During FedEx's third quarter 2018 earnings call, Defendant Graf reaffirmed the FedEx Express 2020 operating income target, stating in pertinent part:   "As Fred mentioned, ***we remain***

***committed to our target of $1.2 billion to $1.5 billion in additional operating profit for the FedEx Express segment in FY 2020 versus FY 2017***, which includes TNT synergies as well as base business and other operational improvements across the global FedEx Express network."

47.    On that same date, Defendant Bronczek touted FedEx's success thus far regarding the TNT integration and restoration of its service levels post-Cyberattack, stating in pertinent part:

> I also want to provide an update on our TNT integration. As you know, this was the most significant acquisition in our company's history, and dramatically improves our global capabilities and competitive posture. ***I'm happy to say that, at TNT, we are seeing strong service levels, and the integration is accelerating. A key element of our acceleration plan was to enable the flow of packages between the legacy TNT and FedEx systems prior to full integration.*** This allows us to direct volumes to the highest service, but the lowest cost networks. This capability is expected to be in place by May 31 of this year.

48.    Finally, Defendant Smith addressed questions from certain analysts regarding TNT's volumes post-Cyberattack, stating that TNT volumes were back to pre-Cyberattack levels:

> The second is from Jack Atkins of Stephens. To what degree was the June cyberattack at TNT negatively impact 3Q results, I guess, it did negatively impact 3Q results at Express, and would you expect any lingering impact in the fourth quarter? Now, I think these questions from Todd and Jack, and I'm going to ask again Dave and David Cunningham to amplify this, reflects a bit of a misunderstanding here, in that, please recall that when we started this fiscal year, we told you that we were no longer going to be talking about Express and TNT.

> So the numbers that are in the Express segment now are the combination of the two. So the reality is, the FedEx Express volumes are growing, ***but the TNT volumes were adversely affected by NotPetya and we are now going back up to where we would have been had this attack not happened***. And let me again give enormous thanks to our sales, our customer service and particularly our IT professionals that did the most unbelievable job of recovering from this attack, which the U.S. government now says was a government or a government-sanctioned attack on the Ukraine, and TNT was just a side victim of it.

> So the fourth quarter will - I think, began to show these at a more granular fashion. ***But we're not seeing decline in Express traffic, in the fourth quarter we will have recovered most of the NotPetya volume from TNT now.***

49.     Defendant Cunningham followed up on Defendant Smith's comments, touting the "remarkable" recovery of TNT's business, stating in pertinent part:

> Yeah, I'd just add a couple of comments to what Fred and Dave just said. I think, first thing you got to remember is the effects in Q3 were mostly one-off type of effects. Q4 ends up being a seasonally strong quarter and we've already told you what that's going to be. Our TNT network was fully restored and back to business as usual as of the end of 2017. ***The recovery of the business over the last five months has been remarkable. And given the value proposition of the TNT road networks, our freight volumes have been strong, and we are experiencing solid growth in these products.*** The cyberattack continues to have a lingering effect in the third quarter, and our existing customer base has not been fully restored - has not fully restored all volumes as they continue to gain confidence in our ability to provide service and recovery of our business. Our outstanding performance during peak is evidence of the strength of our network and our recovery and our sales teams are leveraging this in the fourth quarter, and growing and winning business.

50.     The statements referenced above in ¶¶ 37-39, 42-44, and 46-49 were materially false and misleading as they failed to disclose and/or misrepresented the following adverse facts which were known to Defendants or recklessly disregarded by them:  (i) TNT's overall package volume growth was slowing as TNT's large customers permanently took their business to competitors after the Cyberattack; (ii) as a result of the customer attrition, TNT was experiencing an increased shift in product mix from higher-margin parcel services to lower-margin freight services; (iii) the anticipated costs and timeframe to integrate and restore the TNT network were significantly larger and longer than disclosed; (iv) FedEx was not on track to achieve the TNT Income Improvement Target; and (v) as a result of these undisclosed negative trends and cost issues, FedEx's positive statements about TNT's recovery from the Cyberattack, integration into FedEx's legacy operations, customer mix, customer service levels, profitability, and prospects lacked a reasonable basis.

## THE TRUTH BEGINS TO EMERGE

51.     On June 19, 2018, FedEx released its fourth quarter and full year 2018 results. FedEx reported quarterly earnings and sales that met analyst estimates.  Despite these results,

however, FedEx reported disappointing capital expenditure outlook for its FedEx Express segment, the reporting segment that includes TNT's results, and reported higher-than-expected TNT integration expenses.  On this news, FedEx stock fell $6.96 per share, or 2.69%, to close at $251.43per share on June 20, 2018.

52.     Regardless, Defendants continued to offer positive commentary on the TNT integration and related financial performance metrics.  During the earnings call that same day, Defendant Bronczek made the following positive statements about the TNT integration while reaffirming the TNT Income Improvement Target, stating in pertinent part:  "***The successful integration of TNT and FedEx Express remains a key driver of the FedEx Express FY 2020 operating income improvement target of $1.2 billion to $1.5 billion over FY 2017's results.***"

53.     On the same call, Defendant Cunningham discussed the Company's "remarkable" and "outstanding" recovery following the Cyberattack, stating in pertinent part:

> You can see in the results that we experienced year-over-year double-digit revenue growth in our international package and Freight Services this past quarter. While higher rates were certainly a major contributor, we're also seeing solid year-over-year growth in Freight traffic, a piece of our product portfolio that expanded significantly through the addition of TNT. ***Again, the recovery of the business over the past several months has been remarkable and we certainly owe major thanks to our sales, customer service, and IT professionals who've done an outstanding job of recovering from this attack.***

54.     Finally, Defendant Colleran commented on business growth and "customer loyalty" within the FedEx Express segment, stating in pertinent part:  "Just like to add a comment to that as well.  We greatly appreciate the loyalty that our customers have shown us as we went through this difficult period.  And as you noted, ***I'm also glad to mention that we resumed year-over-year growth in the impacted segments of that business***."

55.     On July 16, 2018, FedEx filed its Form 10-K with the Securities and Exchange Commission for its fiscal year ended May 31, 2018.  Within the filing, FedEx stated that its

FedEx Express segment revenues increased "*despite impacts from the NotPetya cyberattack*," and that international export package yields increased in part due to "*favorable service mix*."

56.     On September 17, 2018, FedEx released disappointing first quarter 2019 results. Defendants attributed these disappointing results to increased labor costs as well as elevated TNT integration expenses.  On this news, FedEx stock fell $14.15 per share, or 5.5%, to close at $241.58 per share on September 18, 2018.  Despite these results, Defendant Bronczek again reaffirmed the FedEx Express profit improvement guidance on the Company's related earnings call, stating in pertinent part:  "*We are very confident in reaching the $1.2 billion to $1.5 billion of operating income improvement that Fred just talked about at FedEx Express in FY 2020 over FY 2017.*"

57.     Defendant Graf also reaffirmed the FedEx Express profit improvement guidance while partially disclosing the truth about how TNT was experiencing a negative service mix, stating in pertinent part:

> *While strong international volume growth reflects our recovery from the TNT cyberattack last year, the impact to operating income was partially offset by shifting service mix and the timing of variable compensation, aircraft maintenance and merit increases.* As we continue to grow package volume, our revenue and overall operating income will benefit. *We remain committed to achieving $1.2 billion to $1.5 billion in operating income improvement at Express.*

58.     Defendant Subramaniam then addressed analyst questions regarding "opportunities for share gains for the combined TNT/FedEx network," stating in pertinent part:

> Yeah Brian, clearly the opportunities are very large. As you all may know and TNT and now FedEx has a fantastic Ground network that handles parcels and pallets in Europe. And TNT is a key player for intra-Europe and Ground markets and key domestic markets in Europe, of course, don't forget that TNT also has a terrific Ground networks in Middle East in Asia and Latin America. So when we combine that with FedEx's unparalleled intercontinental air system, we have a unique network that allows us to offer new value to our customers in a very cost effective manner. And that opens up large international market segments in which we are now extremely well positioned to gain significant share. *And the good news here we are well on our way to unlocking the value and we are pleased*

*with progress as Dave talked about. We are progressing well on the integration.* And customers are already beginning to see this value. And all I can say here is that the sales and marketing teams in the world are very excited to be [sic] see the progress and really provide new value for our customers.

59.     On September 20, 2018, news outlets reported that Michael Holt would retire as FedEx Express Europe's regional COO at the end of September 2018.  Holt would be replaced by Sean Healy.

60.     On September 24, 2018, during FedEx's Annual General Meeting with shareholders, Defendant Smith stated that the Company was "on track" to achieve the TNT Income Improvement Target.  He further made positive statements regarding revenue growth at FedEx Express, as well as TNT service levels and integration efforts, stating in pertinent part:

*FedEx Express posted solid revenue growth and is on track to reach our target $1.2 billion to $1.5 billion improvements in operating income in fiscal 2020 versus 2017* . . . . *We can now report we're seeing strong TNT service levels and our integration of TNT is progressing rapidly.* Great thanks to the teams that worked around the clock and around the world to restore and better secure both the technology systems and our customers' trust in us. We're emerging from this huge challenge stronger than ever.

61.     On November 7, 2018, during the Robert W. Baird Industrial Conference, Defendants continued to affirm the FedEx Express operating income guidance for 2020.  For example, Defendant Lenz stated, in pertinent part:

*And as we get into the home stretch of completing the TNT integration here by May of 2020, that's going to drive tremendous value in terms of what we can leverage there, and that's a key element of the target we've got out there of improving our Express business' operating income by $1.2 billion to $1.5 billion in our fiscal year 2020 versus the fiscal year 2017 baseline.*

62.     At the same conference, Defendant Lenz discussed how TNT had retained customers in the wake of the Cyberattack, stating in pertinent part:

One of the aspects of what gives us confidence in our value are the capabilities that the TNT assets will provide. And in particular, when you put them together with our unmatched global network is -so five, six years ago, UPS tried to acquire TNT and that was ultimately prohibited by regulatory authorities. Well, of course, we were in

trying to take their customers along the way there amidst the disruption and uncertainty, and we couldn't take TNT's customers because they were loyal and the value of what TNT was able to do was significant. Well, similarly now we're experiencing that as well that, ***despite the cyberattack, the customers stuck with us***. ***So, that's what gives us the confidence and basis that, look, this is going to drive even value beyond the immediate of what we're targeting here in FY 2020.***

63.     The statements referenced above in ¶¶ 52-58 and 60-62 were materially false and misleading as they failed to disclose and/or misrepresented the following adverse facts which were known to Defendants or recklessly disregarded by them:  (i) TNT's overall package volume growth was slowing as TNT's large customers permanently took their business to competitors after the Cyberattack; (ii) as a result of the customer attrition, TNT was experiencing an increased shift in product mix from higher-margin parcel services to lower-margin freight services; (iii) the anticipated costs and timeframe to integrate and restore the TNT network were significantly larger and longer than disclosed; (iv) FedEx was not on track to achieve the TNT Income Improvement Target; and (v) as a result of these undisclosed negative trends and cost issues, FedEx's positive statements about TNT's recovery from the Cyberattack, integration into FedEx's legacy operations, customer mix, customer service levels, profitability, and prospects lacked a reasonable basis.

## THE TRUTH EMERGES

64.     On December 7, 2018, FedEx surprised investors by announcing that on December 3, 2018, Defendant Cunningham had entered into a separation agreement with FedEx to retire by December 31, 2018 as the CEO of FedEx Express.  Defendant Cunningham would be replaced by Defendant Subramaniam in that role.  Analysts immediately suggested that Cunningham's "retirement" was a result of performance issues within the FedEx Express segment.

65.     On this news, FedEx stock dropped $13.67 per share, or 6.4%, to close at $201.39 per share on December 7, 2018.

66.     Finally, on December 18, 2018, after the close of trading, FedEx released weak results for its second quarter 2019.  Among other things, FedEx lowered its fiscal 2019 outlook and told investors that the TNT Income Improvement Target would no longer be achievable by the end of fiscal 2020.  During the related earnings call held that evening, Defendant Bronczek attributed these changes to lower package volumes in Europe and stated that "[f]ollowing TNT's recovery from the cyberattack, we have seen an accelerated shift of our product mix to more freight than parcel, putting pressure on our system and of course our costs."

67.     On the same call, Defendant Graf revealed that the integration of TNT was not progressing at the previously touted pace due to, in part, "a change in service mix following the NotPetya cyberattack."  Defendant Graf additionally alerted investors that the TNT Income Improvement Target was no longer achievable, stating in pertinent part:

> The timing and amount of integration expenses and capital investments in any future period may change as we continue to execute the integration of TNT. We expect to realize the benefits of the TNT acquisition that were anticipated when the company was acquired, ***although at a more moderate pace caused by reductions in base business levels due to increasing economic weakness during the second quarter and a change in service mix following the NotPetya cyberattack. As a result, we now expect the operating profit improvement goal of $1.2 billion to $1.5 billion for Express over fiscal year '17 will not be realized in FY '20.***

68.     In response to analysts' questions related to whether the adverse product mix issues were TNT-specific, Defendant Bronczek revealed that post-Cyberattack, TNT's high margin parcel business had failed to grow at the rates the market had been led to expect, stating in pertinent part:

> There is no question about the fact that I mentioned -- made in my comments that one of the things that TNT really did very well, and we continue to do well with TNT inside FedEx, is the freight product and their specialty freight product. So after the cyberattack that product came booming back because no one is better than we

are in that product. So that product, of course, has a little bit different mix, a little bit different cost structure to it. ***We're focusing on our parcels as well. As you pointed out, the questioner pointed out, our volumes are growing, they're just not growing as fast as what we would like them to grow.***

69.     On this news, FedEx stock dropped $22.50 per share, or roughly 12.2%, to close at $162.51 per share on December 19, 2018.

70.     Following FedEx's December 19, 2018 disclosure, analysts drastically slashed their price targets due to the Company's disappointing revelations related to the TNT integration and post-Cyberattack remedial measures, and voiced heightened skepticism at the Company's ability to successfully integrate TNT.  In addition, certain analysts questioned whether Company Executives intentionally chose to maintain guidance on the TNT Income Improvement Target, thereby misleading investors.

71.     For example, on December 19, 2018, Barclays issued a report entitled **"The TNT Mirage"** lowering FedEx's price target and voicing frustration at "the rapid change in management guidance regarding the supposed profit potential of TNT."  The analyst further stated:

> Despite nearly a year of lagging Express segment results following the complete operational shutdown of TNT from a computer virus (missed our margin expectations 4 out of the last 5 quarters), FedEx management until today clearly articulated to the investor community that: 1) TNT was fully operational following the cyberattack; and 2) aggressive profit improvement plans were "confidently" on track . . . . ***While we think Express results following the cyberattack clearly indicated mix recovery challenges in the TNT business, management chose to maintain guidance until today's cut.*** Perhaps this analyst will be less trusting of management commentary going forward.

72.     Deutsche Bank also issued a report entitled "**F2Q First Look . . . Bad**," which criticized Defendants' lack of transparency with regards to TNT:  "***The commentary around Europe is not very satisfying, as it likely reflects significant underperformance at TNT, on which Mgmt. is still not offering necessary details (we believe TNT volumes are more heavily***

*skewed towards larger, palletized freight, as opposed to parcel, making the read-through to other global package-delivery companies less meaningful, in our view).*"

73.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## POST CLASS PERIOD DISCLOSURES

74.     On February 14, 2019, FedEx announced the abrupt resignation of Defendant Bronczek from the role of President and COO of the Company, effective February 28, 2019. Defendant Subramaniam would replace Defendant Bronczek in his role.

75.     On March 19, 2019, FedEx reported its fiscal third quarter 2019 results. Defendants again reported disappointing earnings and revenues well below analysts' estimates and reduced FedEx's full year guidance for its fiscal 2019 for the second time.   Further, Defendants revealed that the TNT integration costs were now expected to exceed the previously projected $1.5 billion.   On the related earnings call, Defendant Graf stated with regard to the TNT integration that only *now* was TNT seeing improved service levels as well as the return of legacy customers, stating in pertinent part:

> I think you heard Raj and Rob talk about, what's happening with TNT integration. ***But we're now finally getting service improvements at lower costs. We're speeding up and network by a day on 40% of the traffic. Customers are coming back.*** So, it's just a matter of time we have another year of integration to go. But we definitely need a little bit better economic environment in Europe to get the full benefits of TNT. We will get the full financial benefits of TNT, I have no doubt it's just a matter of when.

76.     On the same call, in response to an analyst's question about whether FedEx had been able to "regain share in the European parcel market following the restoration of TNT service levels in early January," Defendant Subramaniam stated that only recently had the high margin parcel business begun to improve, stating in pertinent part:

The short answer that question is, yes. We are seeing actual -- we're higher year-over-year growth every month from the last 3 months we're seeing accelerating year-over-year increased in revenue and volumes in the European possible business. And as we have stabilized and improving our service levels. So it's not a surprise, you despite the economic headwinds in Europe. We now have a terrific value proposition. As I said in the opening remarks, we're releasing new value to our customers. ***We've improved our service and the customers are responding. So, we are seeing increased revenue, increased volumes in our core parcel business.***

77.     Following this news, analysts reacted negatively.  For example, in a report from Barclay's, the analyst lowered their full year 2020 earnings estimate for the Company by 11%, citing in part "limited visibility on Express margin recovery, [and] a longer integration of TNT." Additionally, an analyst at Credit Suisse stated in a report that the Company was "Not Out of the Woods Yet on Express/TNT," and that "[g]iven prior execution challenges, this will continue to be a `show me' story rather than a 'tell me' story."  Finally, JP Morgan cut its FedEx price target for the *second* time in three months, attributing the cut to rapid management turnover and the "**failed TNT integration**."

78.     Then, on June 25, 2019, the Company issued its fiscal fourth quarter 2019 earnings release, which continued to show lingering effects from the Cyberattack.  FedEx reported mixed quarterly results and another disappointing outlook.  While quarterly adjusted earnings met analysts' estimates, the Company missed analysts' topline sales targets.  FedEx's weak fiscal 2020 was due in part to the "continued mix shift to lower-yielding services" at the FedEx Express segment as a result of the Cyberattack.  The Company also quantified the previously announced increase to the TNT integration expense forecast.  Specifically, FedEx stated that "[t]otal TNT Express integration program expenses through fiscal 2021 are now estimated to be approximately $1.7 billion."

## ADDITIONAL SCIENTER ALLEGATIONS

79.     During the Class Period, as alleged herein, the Individual Defendants acted with scienter in that the Individual Defendants knew or were reckless as to whether the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew or were reckless as to whether such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

80.     The Individual Defendants permitted FedEx to release these false and misleading statements and failed to file the necessary corrective disclosures, which artificially inflated the value of the Company's securities.

81.     As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding FedEx, their control over, receipt, and/or modification of FedEx's allegedly materially misleading statements and omissions, and/or their positions with the Company that made them privy to confidential information concerning FedEx, participated in the fraudulent scheme alleged herein.

82.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of FedEx securities by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme deceived the investing public regarding FedEx's business, operations, and management, as well as the intrinsic value of FedEx securities, and caused Plaintiff and members of the Class to purchase FedEx securities at artificially inflated prices.

## APPLICATION OF PRESUMPTION OF RELIANCE:
## <u>FRAUD ON THE MARKET</u>

83.    Plaintiff will rely upon the presumption of reliance established by the fraud on the market doctrine in that, among other things:

a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b)    the omissions and misrepresentations were material;

c)    FedEx securities traded in an efficient market;

d)    the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of FedEx securities; and

e)    Plaintiff and other members of the Class purchased FedEx securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

84.    At all relevant times, the market for FedEx securities was efficient for the following reasons, among others:

a)    as a regulated issuer, FedEx filed periodic public reports with the SEC;

b)    FedEx regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

c)    FedEx was followed by several securities analysts employed by major brokerage firm(s) who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace; and

d)      FedEx securities are actively traded in an efficient market, namely the NYSE, under the ticker symbol "FDX."

85.     As a result of the foregoing, the market for FedEx securities promptly digested current information regarding FedEx from publicly available sources and reflected such information in FedEx's share price.   Under these circumstances, all purchasers of FedEx securities during the Class Period suffered similar injury through their purchase of FedEx securities at artificially inflated prices and the presumption of reliance applies.

86.     Further, to the extent that the Defendants concealed or improperly failed to disclose material facts with regard to the Company, Plaintiff is entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128, 153 (1972).

## LOSS CAUSATION/ECONOMIC LOSS

87.     During the Class Period, as detailed herein, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of FedEx securities and operated as a fraud or deceit on Class Period purchasers of FedEx securities by misrepresenting the value of the Company's business and prospects as detailed herein.   As Defendants' misrepresentations and fraudulent conduct became apparent to the market, the price of FedEx securities fell precipitously, as the prior artificial inflation came out of the price.   As a result of their purchases of FedEx securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## NO SAFE HARBOR

88.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.

The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.   Additionally, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.   Alternatively, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of FedEx who knew that the statement was false when made.

## CLASS ACTION ALLEGATIONS

89.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all persons or entities who purchased or otherwise acquired FedEx securities during the Class Period (the "Class").   Excluded from the Class are: Defendants (as defined herein); the officers and directors of the Company during the Class Period (the "Excluded D&Os"); members of Defendants' and the Excluded D&Os' immediate families; the subsidiaries and affiliates of the Company, including the Company's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and any entity in which Defendants or the Excluded D&Os have or had a controlling interest; and the legal representatives, heirs, successors or assigns of any excluded person or entity.

90.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

91.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

92.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

93.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a)      whether the Exchange Act was violated by Defendants as alleged herein;

b)      whether statements made by Defendants misrepresented material facts about the business, operations and management of FedEx; and

c)      to what extent the members of the Class have sustained damages and the proper measure of damages.

94.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated
Thereunder Against All Defendants**

95.     Plaintiff repeats and re-alleges each and every allegation contained in the
foregoing paragraphs as if fully set forth herein.

96.     During the Class Period, Defendants disseminated or approved the false
statements specified above, which they knew or recklessly disregarded were misleading in that
they contained misrepresentations and failed to disclose material facts necessary in order to make
the statements made, in light of the circumstances under which they were made, not misleading.

97.     Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that
they:

        a)      employed devices, schemes, and artifices to defraud;

        b)      made untrue statements of material facts or omitted to state material facts
necessary in order to make the statements made, in light of the circumstances under which they
were made, not misleading; or

        c)      engaged in acts, practices, and a course of business that operated as a
fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of
FedEx securities during the Class Period.

98.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity
of the market, they paid artificially inflated prices for FedEx securities.  Plaintiff and the Class
would not have purchased FedEx securities at the prices they paid, or at all, if they had been
aware that the market prices had been artificially and falsely inflated by Defendants' misleading
statements.

99.     As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of FedEx securities during the Class Period.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act
### Against All Defendants

100.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

101.    The Individual Defendants acted as controlling persons of FedEx within the meaning of Section 20(a) of the Exchange Act.  By virtue of their positions and their power to control public statements about FedEx, the Individual Defendants had the power and ability to control the actions of FedEx and its employees.  By reason of such conduct, Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.      Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.      Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.      Awarding rescission or a rescissory measure of damages; and

E.      Awarding such equitable/injunctive or other relief as deemed appropriate by the Court.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated:  July 2, 2019                                     Respectfully submitted,

POMERANTZ LLP

*/s/ Jeremy A. Lieberman*
Jeremy A. Lieberman
J. Alexander Hood II
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jalieberman@pomlaw.com
Email: ahood@pomlaw.com

POMERANTZ LLP
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
Email: pdahlstrom@pomlaw.com

*Attorneys for Plaintiff*

## CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1. I, _Selwyn Karp_, make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2. I have reviewed a Complaint against FedEx Corporation ("FedEx" or the "Company"), and authorize the filing of a comparable complaint on my behalf.

3. I did not purchase or acquire FedEx securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4. I am willing to serve as a representative party on behalf of a Class of investors who purchased or acquired FedEx securities during the class period, including providing testimony at deposition and trial, if necessary. I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5. To the best of my current knowledge, the attached sheet lists all of my transactions in FedEx securities during the Class Period as specified in the Complaint.

6. During the three-year period preceding the date on which this Certification is signed, I have not served or sought to serve as a representative party on behalf of a class under the federal securities laws.

7. I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.   I declare under penalty of perjury that the foregoing is true and correct.

Executed ____6/27/19____
(Date)

_____
(Signature)

____Selwyn Karp____
(Type or Print Name)

**FedEx Corporation (FDX)**                                                                 **Karp, Selwyn**

### List of Purchases and Sales

| Date | Purchase or Sale | Number of Shares/Unit | Price Per Share/Unit |
|------|------------------|-----------------------|----------------------|
| 12/14/2018 | Purchase | 500 | $186.1720 |