UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

┌─────────────────────────────┐
│ USDC-SDNY                   │
│ DOCUMENT                    │
│ ELECTRONICALLY FILED        │
│ DOC#:                       │
│ DATE FILED:                 │
└─────────────────────────────┘

IN RE FED EX CORP. SECURITIES
LITIGATION

Master File No. 1:19-cv-05990 (RA)

No.  1:19-cv-06183 (RA)
1:19-cv-08723 (RA)

OPINION & ORDER

CLASS ACTION

RONNIE ABRAMS, United States District Judge:

Lead Plaintiff City of Bradford Metropolitan District Council as administering authority to the West Yorkshire Pension Fund ("West Yorkshire" or "Plaintiff") brings this putative class action against FedEx Corporation ("FedEx" or the "Company") and several current and former officers of the Company (collectively, "Defendants"), alleging that Defendants committed securities fraud in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Securities and Exchange Commission ("SEC") Rule 10(b)-5.  Specifically, Plaintiff alleges that, from September 19, 2017 until December 18, 2018, Defendants made numerous statements that misled the market as to the financial impact of a June 2017 Russian cyberattack on FedEx's recently acquired European shipping subsidiary, TNT Express Services B.V. ("TNT").

Defendants moved to dismiss the complaint pursuant to Federal Rules of Civil Procedure 8(a), 9(b), and 12(b)(6) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4.  Defendants contend that the complaint fails to allege sufficient facts to demonstrate (1) that Defendants made any actionable misrepresentations or omissions or (2) a

strong inference that Defendants acted with the requisite scienter.  Because the Court concludes that the complaint fails to adequately plead the required elements of falsity and scienter, Defendants' motion to dismiss is granted.

## BACKGROUND

### I.    Factual Background

The facts alleged in the Consolidated Amended Complaint ("Complaint"), Dkt. 64, are assumed to be true for the purposes of this motion.  *See, e.g., Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 35 (2d Cir. 2017).  The Court also considers facts drawn from the news releases, financial reports, and transcripts of earnings calls that contain the statements that Plaintiff alleges were false or misleading, and which are incorporated into the Complaint by reference.  *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir. 2007).

### A.    The Parties

Defendant FedEx is a publicly traded global logistics company headquartered in Tennessee.  *See* Compl. ¶ 15.  FedEx operates through four "business segments," (1) FedEx Express, (2) FedEx Freight, (3) FedEx Ground, and (4) FedEx Services.  *Id.* ¶ 25.  As relevant here, FedEx Express is the business segment responsible for express shipping and accounted for 54% of the Company's total revenue for fiscal year 2019.  *Id.* ¶ 26.

Defendant Frederick W. Smith, the founder of FedEx, served as the Company's Chairman, President and Chief Executive Officer ("CEO") throughout the period of September 19, 2017 until December 18, 2018 (the alleged "Class Period").  *Id.* ¶ 16.  During the Class Period, Defendant Alan B. Graf served as the Company's Chief Financial Officer, Defendant David J. Bronczek was the Company's Chief Operating Officer, Defendant Rajesh Subramaniam was the Company's Chief Marketing and Communications Officer, and Defendant David L. Cunningham served as

CEO and President of FedEx Express. *Id.* ¶¶ 17-20. Defendant Michael C. Lenz served as the Company's Treasurer and Corporate Vice President, while Defendant Robert B. Carter was the Executive Vice President of FedEx Information Services and Chief Information Officer. *Id.* ¶¶ 22-23.

Plaintiff West Yorkshire seeks to represent all persons and entities who purchased FedEx common stock during the Class Period, and who were damaged thereby. *See id.* ¶¶ 14, 148.

### B.      The Acquisition of TNT

On May 25, 2016, FedEx acquired TNT, "a Netherlands-headquartered package-delivery company with expansive and well-established operations throughout Europe," for approximately $4.8 billion. *See* Compl. ¶¶ 4, 29. This acquisition "materially expanded" the Company's presence in Europe, making FedEx the second largest logistics operator on that continent and increasing FedEx Express's revenues by nearly a third. *Id.* ¶¶ 4, 32. The integration of TNT became a "primary area of focus" for the Company, which it publicly estimated would take four years. *Id.* ¶ 5. In a March 2, 2017 press release, the Company made a commitment to increase the operating income at FedEx Express by $1.2 billion to $1.5 billion in fiscal year 2020 versus fiscal year 2017. *Id.* ¶ 33. During an earnings call that month, Defendant Bronczek described the TNT integration as a "key driver to [that] operating income improvement target." *Id.* ¶ 35. The Company's February 2017 quarterly had indicated that the target "include[d] TNT Express synergies as well as base business and other operational improvements across the global FedEx Express network." Dkt. 82, Declaration of Susan L. Saltzstein in Support of Defendants' Motion to Dismiss the Consolidated Amended Complaint ("Saltzstein Declaration"), Exhibit 6 at 5.

C.      The NotPetya CyberAttack

On June 28, 2017, FedEx announced in a press release that TNT had been impacted by "NotPetya", a computer virus planted in Ukrainian computer systems that "spread throughout Europe and beyond in late-June 2017," permanently disabling infected computer systems.  Compl. ¶¶ 3, 36.  The release stated that

> the worldwide operations of [FedEx's] TNT Express subsidiary have been significantly affected due to the infiltration of an information system virus.  While TNT Express operations and communications systems have been disrupted, no data breach is known to have occurred. The operations of all other FedEx companies are unaffected and services are being provided under normal terms and conditions.
>
> Remediation steps and contingency plans are being implemented as quickly as possible. TNT Express domestic country and regional network services are largely operational, but slowed. We are also experiencing delays in TNT Express inter-continental services at this time. We are offering a full range of FedEx Express services as alternatives.
>
> Updates on service availability will be provided periodically as systems are remediated. Customers seeking updated information on service availability should call TNT Express Customer Service or visit TNT Express's website at tnt.com.
>
> We cannot measure the financial impact of this service disruption at this time, but it could be material.

Saltzstein Declaration, Exhibit 7 at 6.

According to Plaintiff's confidential witness ("CW")—who worked as a Senior Business Relationship Manager at TNT's United Kingdom headquarters from June 2015 to April 2019— "Not Petya crippled TNT's operations within seconds and wiped out 75 critical systems, 37,000 PCs (desktop computers) and between 4,000 and 9,000 Windows servers."  Compl. ¶ 40 & n.2. The CW stated that "the progress of the integration took a stop" "at that point," preventing the Company from keeping within its four-year integration timeline.  *Id.*  ¶ 40. "The CW recounted that recovery of the systems disabled by NotPetya took approximately 6 months to complete and approximately 25% of the affected programs were never restored."  *Id.*  According to the CW,

NotPetya disabled approximately 75 of TNT's critical global systems, including the "custom clearance system" responsible for international freight and package delivery services.  *Id.* ¶ 41.  "As a result, TNT's international shipments were largely disabled for at least 6 months."  *Id.*  The CW "estimated that that approximately 10% of the Company's high-margin business (customers that generated between a 10% and 13% margin for TNT) abandoned TNT in favor of competitors," significantly impacting TNT's sales.  *Id.*  Per the CW, "there was significant doubt within the Company about its ability to meet the [operating income improvement] target by 2020."  *Id.* ¶ 42.

### D.    Defendants' Statements About NotPetya During the Class Period

On September 19, 2017, the first day of the Class Period, FedEx issued a quarterly earnings report that "disclosed that the [NotPetya] attack impacted the results for the quarter by approximately $300 million."  Compl. ¶ 37.  The report added that "[m]ost TNT Express services resumed during the quarter and substantially all TNT Express critical operational systems have been restored," although "TNT Express volume, revenue and profit still remain below previous levels."  Saltzstein Declaration, Exhibit 10 at 2; *see also* Compl. ¶ 53.  The Company also announced that it was "lowering its fiscal 2018 forecast due to the estimated full-year impacts of the TNT Express cyberattack."  Saltzstein Declaration, Exhibit 10 at 2.

During that day's earnings call, Graf stated that the attack "resulted in a significant business interruption and financial impact," in the form of lost revenue and recovery costs, and that "the complexity of clearance systems and business processes" had resulted in delays in the restoration of the Company's "international business."  Saltzstein Declaration, Exhibit 9 at 5.  Graf added that, for the remainder of fiscal year 2018, FedEx "expect[ed] to experience ongoing, but diminishing, financial impacts from the cyber-attack in the form of lower revenues and higher investments to further improve and strengthen our IT infrastructure," but reaffirmed the

5

Company's commitment to the operative income improvement target. *Id.* Smith reiterated that commitment and expressed "confiden[ce] in [the Company's] prospects for long-term profitable growth." Compl. ¶ 56.

Describing FedEx's recovery efforts on that call, Carter expressed that the Company had "restored the TNT systems to a near-normal state, with virtually all critical systems up and available." *Id.* ¶ 57.   Carter also stated that "[i]ntegration efforts [would] be expedited," *id.* ¶ 58, which would possibly result in "an increase in integration spending on technology," Saltzstein Declaration, Exhibit 9 at 6.   Bronczek subsequently declared that "international export package revenue for [the FedEx Express] segment grew 4% in the quarter after absorbing the impact of the cyber-attack." Compl. ¶ 55.   Touting the "significant progress on the recovery of the TNT business and IT systems," Bronczek announced that "core shipping services [were] back in place with all TNT Express depots, hubs and operating facilities," and that existing infrastructure networks had allowed FedEx to "retain a significant portion of [the] TNT customer base."   Saltzstein Declaration, Exhibit 9 at 6; *see* Compl. ¶ 59.   He added that

> [w]ith strong service levels and operations returning to near-normal capabilities, our focus now shifts to finalizing the restoration of certain key customer-specific solutions and their systems. We expect these IT capabilities to be restored by the end of this month, enabling business-as-usual operations with full capabilities across all customer segments just in time for peak shipping.

Compl. ¶ 60.   On September 20, 2017, FedEx stock increased by 2.1%, closing at $220.50 per share. *Id*. ¶ 68.

In its subsequent quarterly earnings report, filed in December 2017, FedEx reported that improved quarterly results "were partially offset by the continued impact of the NotPetya cyberattack described below," a negative impact estimated at "$100 million . . . in the second quarter of 2018 and . . . $400 million . . . in the first half of 2018."   Saltzstein Declaration, Exhibit

11 at 28.  Although "[a]ll of TNT Express's critical operational systems have now been fully restored, critical business data has been recorded, and shipping services and solutions are back in place[,] . . . not all customers are shipping at pre-attack volume levels."  *Id.*  The Company reiterated its expectation of "ongoing, but diminishing, financial impacts from the cyberattack in the second half of 2018 in the form of lower revenues."  *Id.* at 34.  With respect to revenues for the FedEx Express Segment, FedEx reported that "[i]nternational export package yields increased 4% in the second quarter and 3% in the first half of 2018 due to higher fuel surcharges, favorable exchange rates, and favorable service mix," Compl. ¶ 77, but noted that increases in average daily international export volumes were offset "by the decrease in volume due to the NotPetya cyberattack," Saltzstein Declaration, Exhibit 11 at 39.  In the risk factors section of the report, the Company stated that "***TNT Express experienced a significant cyberattack in the first quarter of fiscal 2018 and the ongoing impact could negatively affect our results of operations and financial condition in the future, particularly if our continuing recovery efforts do not proceed as expected.***"  *Id.* at 50 (emphasis in original).  The report went on to list potential negative effects including "loss of revenue due to permanent customer loss," "longer and more costly integration . . . of TNT Express and FedEx Express," and "reputational damage resulting in the failure to retain or attract customers."  *Id.*

FedEx reported in the press release accompanying the report that it was "accelerating the integration process and increasing investments to move TNT Express information technology and operational infrastructure to FedEx infrastructure due to the recent cyberattack at TNT Express," resulting in an increase of $600 million in integration costs.  Compl. ¶ 69.  Describing FedEx's "success in restoring business impacted by this summer's cyberattack" on that day's conference call, Graf reaffirmed the Company's commitment to its operative income improvement target, and

announced an increased "fiscal 2018 forecast." *Id.* ¶¶ 70, 73. Bronczek stated that TNT's operations were "back to normal after the June cyberattack" and experiencing "strong service levels," and that "[t]he IT recovery process [was] complete." *Id.* ¶ 74. Carter added that the Company had "become much more aggressive about improving the security posture, reliability and speeding up the integration of the technology platforms" "on the heels of the cyberattack." *Id.* ¶ 76. FedEx's stock price increased by 3.5% the following day, closing at $251.07. *Id.* ¶ 80.

FedEx released its next earnings report on March 20, 2018, and held a conference call with analysts and investors. *Id.* ¶ 81. The company announced that was increasing its fiscal 2018 earnings outlook, and remained "committed to improving operating income at the FedEx Express segment by $1.2 to $1.5 billion in fiscal 2020 versus fiscal 2017." Saltzstein Declaration, Exhibit 13 at 3; *see* Compl. ¶ 87. FedEx noted that revenue increased "despite a lingering impact from the June cyberattack affecting TNT express," and that the results were primarily affected by, *inter alia*, "[h]igher TNT Express integration expenses." Saltzstein Declaration, Exhibit 13 at 4. The report announced that "results for the first half of 2018 were negatively impacted by the NotPetya cyberattack by an estimated $400 million . . . primarily from loss of revenue due to decreased shipments in the TNT Express network, as well as incremental costs to restore information technology systems," and that the Company "continued to experience lingering revenue impacts from the NotPetya in the third quarter of 2018 in the form of lower volumes at TNT express." *Id.* at 30. The Company also represented that "substantially all TNT Express services were fully restored during the first quarter of 2018," and that "TNT Express's critical operational systems were fully restored" as of the second quarter of 2018. Compl. ¶ 88.

Providing an update on TNT integration, Bronczek told investors that he was "happy to say that at TNT, [the Company is] seeing strong service levels and the integration is accelerating,"

announcing that the "integration of [FedEx's] global sales force" was expected "to be complete 1 full year early" in fiscal year 2019. Compl. ¶¶ 83-84. On that call, Smith predicted that FedEx Express would "have recovered most of the NotPetya volume from TNT" by the fourth quarter, as he was not "seeing [a] decline in Express traffic." *Id.* ¶ 85. Defendant Cunningham also represented that TNT's "network was fully restored and back to business as usual as of the end of 2017." *Id.* ¶ 86.

On June 19, 2018, FedEx released its fourth quarter and 2018 annual results, reporting "higher-than-expected TNT integration expenses of $136 million." *Id.* ¶ 90. On the related earnings call, Cunningham described the recovery of the business over the past several months as "remarkable," thanking the professionals who did an outstanding job "recovering from this attack." *Id.* ¶ 93. On June 20, 2018, FedEx stock declined by 2.7% to close at a price of $251.43. *Id.* ¶ 96.

The Company's annual 10-K report, submitted on July 16, 2018 and reporting financial results through May 31, 2018, stated that total integration costs were expected to rise from $1.4 to $1.5 billion and warned of the possibility that the ongoing process could result in "higher than expected" costs. Saltzstein Declaration, Exhibit 2 at 85. That report cautioned that "*[t]he failure to integrate successfully the businesses and operations of FedEx Express and TNT Express in the expected time frame and at the expected cost may adversely affect our future results*." *Id.* (emphasis in original). A section entitled "FedEx Express Segment Operating Income" further stated:

> FedEx Express segment operating income and margin decreased in 2018 primarily due to the impacts from the NotPetya cyberattack and higher TNT Express integration expenses, partially offset by yield growth and the positive net impact of fuel.

> The NotPetya cyberattack had an estimated $400 million negative impact for the first half of 2018. Results also include $380 million of TNT Express integration expenses in 2018, a $174 million increase from 2017.

9

*Id.* at 66.   Reiterating its operating income improvement target, the report also stated that "substantially all TNT Express services were fully restored during the first quarter of 2018. As of the second quarter of 2018, all of TNT Express's critical operational systems were fully restored, critical business data was recovered and shipping services and solutions were back in place." Compl. ¶¶ 98-99.

FedEx's next quarterly report, issued on September 17, 2018, again stated that the Company was "targeting operating income improvement at the FedEx Express segment of $1.2 billion to $1.5 billion in 2020 from 2017," assuming certain exogenous factors.   Saltzstein Declaration, Exhibit 15 at 33.   That projection was reiterated by Smith on a related earnings call. Compl. ¶ 101.   The report stated that "FedEx Express segment operating income and margin increased in the first quarter of 2019 due to international package and freight volume recovery from the NotPetya cyberattack," that "changes in service mix following the NotPetya cyberattack negatively impacted operating margin[s]," and that the first quarter results included "approximately $102 million of TNT Express integration expenses, a $14 million increase from the first quarter of 2018."   Saltzstein Declaration, Exhibit 15 at 37; *see* Compl. ¶ 102.   Defendant Subramiam told investors that "we are progressing well on the integration, and customers are already beginning to see the value." *Id.* ¶ 105.   The following day, FedEx's stock price fell by 5.5%, closing at $241.58. *Id.* ¶ 109.

### E.     FedEx's December 2018 Disclosures

On December 7, 2018, the Company disclosed that Cunningham had entered into a separation agreement with FedEx and would depart his position as CEO of FedEx Express by December 31, 2018.  Compl. ¶ 114.

In its December 2018 quarterly report, released on the final day of the Class Period, the Company conceded that "the target to increase FedEx Express operating income by $1.2 billion to $1.5 billion over fiscal 2017 results [would] not be achieved in fiscal 2020." *Id.* ¶ 118.  Citing declining revenue in Europe and Asia, the report explained that "reductions in base business levels largely due to increasing international economic weakness during the second quarter . . . and a change in service mix following the NotPetya cyberattack" would delay past 2020 the realization of the benefits of the TNT acquisition.  Saltzstein Declaration, Exhibit 16 at 36.  Although the FedEx Express segment reported an 8% increase in revenue in the first half of 2019 "primarily due to international package and freight volume recovery from the NotPetya attack," the segment "experienced a deceleration in international package volume growth during the quarter [due to] a significant slowing of the Eurozone economic, as well as continued softness in economic conditions in Asia." *Id.* at 41.  At the earnings call, Bronczek explained that the cyberattack had precipitated an "accelerated shift of our production mix to more freight than parcel, putting pressure on our system and of course, our costs."  Compl. ¶ 120.  Following this news, FedEx's share price fell by 12.2%, closing at $162.51 per share on December 19, 2018.  *See id.* ¶ 124.

## II.    Procedural Background

On June 26, 2019, Plaintiff Rhode Island Laborers' Pension Fund, individually and on behalf of all others similarly situated, brought suit against Defendants for securities fraud.  On July 2, 2019, Plaintiff Selwyn Karp filed a class action complaint against Defendants that alleged substantially similar violations of the securities laws.  *See* No. 19-cv-06183, Dkt. 1.  Plaintiff Salvatore Tagliareni brought the same allegations in a derivative suit filed on September 19, 2019.  *See* No. 19-cv-08723, Dkt. 1.  In an Opinion and Order dated October 18, 2019, the Court consolidated the related actions and granted West Yorkshire's unopposed motion for appointment

as lead plaintiff.  Dkt. 57.  On January 13, 2020, Plaintiff filed a Consolidated Amended Complaint, the operative complaint in this action.  Dkt. 64.  Defendants moved to dismiss the Complaint on March 13, 2020.  Dkt. 81.  The Court held oral argument on the motion on January 28, 2021.

## III.  Allegations in the Complaint

The Complaint alleges that, throughout the Class Period, FedEx misrepresented the status of its recovery from the NotPetya cyberattack.  According to Plaintiff, the Company's statements on the subject were materially misleading because they failed to disclose 1) that TNT's international service was "largely disabled" for six months due to the virus; 2) that TNT was losing a significant proportion of its high-margin customers due to its failure to operate internationally; and 3) that NotPetya had substantially delayed, rather than accelerated, the integration of TNT into FedEx Express.  *See* Compl. ¶¶ 63, 78, 89, 95, 100, 107, 110, 113.  Plaintiff avers that these facts— alleged by the CW or belatedly revealed to the market following the Class Period—demonstrate that "Defendants lacked a reasonable basis for their positive statements about the Company and its prospects, including its ability to meet the TNT Income Improvement Target."  *Id.*

These "positive statements about the Company and its prospects" can be grouped into four categories: 1) references to the operating income improvement target; 2) statements regarding FedEx's progress in restoring TNT operations in the wake of NotPetya; 3) reassurances about the retention of TNT's customer base; and 4) statements concerning the pace and cost of TNT integration.

Additionally, Plaintiff avers that Defendants' statements violated a separate statutory duty under Item 303 of Regulation S-K ("Item 303"), which requires disclosure of any known trends or uncertainties reasonably expected to have a material impact on net sales, revenues or income.

12

Plaintiff alleges that Item 303 obligated FedEx to disclose the negative impact of NotPetya on TNT's operations.

To establish that Defendants acted with the requisite scienter—*i.e.*, that they knew, or recklessly disregarded, the falsity or misleading nature of their public statements—the Complaint alleges that the individual defendants "were active and culpable participants in the fraudulent scheme," by virtue of their "receipt of information reflecting the true facts regarding FedEx," and their control over the public disclosure of the allegedly false statements. *Id.* ¶ 138.  According to Plaintiff, the individual defendants were "aware of key facts related to the Company's operations" that contradicted public statements about the lingering effects of NotPetya because of their positions as executive officers of FedEx, and because "FedEx's senior management, including the Individual Defendants, were in regular communication with TNT executives in Europe and took an active role in the integration of TNT into FedEx Express and the recovery efforts." *Id.* ¶¶ 139, 143, 147.

For the reasons that follow, the Court concludes that the Complaint fails to plausibly allege that any of these four categories of statements were false or materially misleading when made. The Court further concludes that the Complaint does not plead sufficient facts to raise a strong inference of scienter.  Because falsity and scienter are required elements of all the causes of action brought by Plaintiff,  Defendants' motion to dismiss the Complaint is granted.

## STANDARD OF REVIEW

### I.    Motions to Dismiss Under Federal Rule of Civil Procedure 12(b)(6)

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content

that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Under Rule 12(b)(6), the question is "not whether [the plaintiff] will ultimately prevail," but "whether his complaint [is] sufficient to cross the federal court's threshold." *Skinner v. Switzer*, 562 U.S. 521, 529-30 (2011) (internal quotation marks omitted). In answering this question, the Court must "'accept[] all factual allegations as true, but giv[e] no effect to legal conclusions couched as factual allegations.'" *Stadnick*, 861 F.3d at 35 (2d Cir. 2017) (quoting *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010) (other internal quotation marks omitted)). The Court may also consider any "statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied" in bringing this action. *ATSI Commc'ns*, 493 F.3d at 98.

## II.    Motions to Dismiss Under Federal Rule of Civil Procedure 9(b) and the PLSRA

This action for securities fraud is also subject to the heightened pleading requirements of Fed. R. Civ. P. 9(b) and the PSLRA. *See, e.g.*, *ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. J.P. Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009). Under this standard, a plaintiff alleging fraud "must state with particularity the circumstances constituting" the alleged fraud. Fed. R. Civ. P. 9(b). The PSLRA expressly requires plaintiffs alleging securities fraud to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief . . . all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Under the PLSRA and Rule 9(b) pleading requirements, a plaintiff must explain with particularity "the basis for the plaintiff's belief that the omitted fact was known at the time of the statement." *In re Mindbody, Inc. Sec. Litig.*,

14

No. 19-CV-8331 (VEC), 2020 WL 5751173, at *7 (S.D.N.Y. Sept. 25, 2020). The PLSRA further requires that securities-fraud complaints "'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345 (2005) (quoting 15 U.S.C. §§ 78u–4(b)(2)). "Allegations that are conclusory or unsupported by factual assertions are insufficient." *ATSI Commc'ns*, 493 F.3d at 99.

## DISCUSSION

Defendants further three principal arguments as to why the Complaint fails to state a claim for securities fraud. First, Defendants argue that the Complaint does not adequately allege that any of the challenged statements were false or misleading at the time they were made, especially when considered in the context of FedEx's numerous and contemporaneous disclosures about the challenges of recovering from NotPetya. Second, Defendants contend that many of those statements were forward-looking statements protected under the PSLRA's safe harbor, immunizing them from liability. Finally, Defendants argue that the alleged facts are insufficient to raise the inference that any Defendant acted with the requisite scienter. According to Defendants, failure to meet these pleading requirements mandates dismissal of the Plaintiff's claims under Section 10(b), Section 20(a), and Item 303.

**I.      Whether Defendants Violated Section 10(b) of the Securities Exchange Act and SEC Rule 10b-5**

Under Section 10(b) of the Securities Exchange Act, it is

> unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange ... [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).

15

Rule 10b-5, promulgated by the SEC under Section 10(b) to define 'manipulative and deceptive devices,' prohibits persons from "(1) making 'any untrue statement of a material fact' and (2) from 'omit[ting] to state a material fact necessary in order to make [ ] statements made, in the light of the circumstances under which they were made, not misleading' in connection with the purchase or sale of any security." *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 174 (2d Cir. 2020) (quoting 17 C.F.R. § 240.10b-5(b)).   While "the first part of this language unambiguously renders untrue statements of fact actionable," "the second part of this language, which does not cabin 'statements' with the modifier 'of a material fact,' renders both statements of fact and those of opinion actionable when such statements would be misleading without the contextualization of material facts." *Id*.

To maintain a private damages action under Section 10(b) and Rule 10b-5, "a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 157 (2008).  Defendants' motion challenges only the first two factors.  The Court addresses each in turn.

### A.  Whether Plaintiff Adequately Alleges that Defendants' Statements Were False or Misleading

Defendants principally contend that Plaintiff fails to adequately plead the falsity of FedEx's statements about its recovery from NotPetya because those same statements were accompanied by numerous disclosures about the difficulties faced and expenses incurred by FedEx in that process. Having considered the documents that the Complaint incorporates by reference, the Court agrees.

Even accepting Plaintiff's allegations as true, the Court concludes that the challenged statements, when considered in their full context, would not mislead a reasonable investor as to

16

NotPetya's effect on the Company or as to the status of the TNT integration.  FedEx's numerous disclosures during the Class Period belie Plaintiff's contention that FedEx "*belatedly* disclosed to the market the damage the NotPetya virus had caused to the Company and . . . the FedEx Express/TNT segment" in December 2018.  Compl. ¶ 47 (emphasis added).

Under those circumstances, Defendants' professed optimism about TNT in the wake of the NotPetya attack is an insufficient basis for securities fraud, even though hindsight suggests that such optimism may have been misguided.  To support a finding of liability, "Rule 10b-5 expressly requires an actual *statement*, one that is either 'untrue' outright or 'misleading' by virtue of what it omits to state." *In re Vivendi, S.A. Sec. Litig*., 838 F.3d 223, 239 (2d Cir. 2016) (emphasis in original).  Establishing the "literal truth of an isolated statement is insufficient" grounds for dismissal of a complaint for securities fraud; "the proper inquiry requires an examination of defendants' representations, taken together and in context." *Meyer v. Jinkosolar Holdings Co.,* 761 F.3d 245, 250–51 (2d Cir. 2014) (internal quotation marks omitted).  When a defendant makes a disclosure about a particular topic, "the representation must be complete and accurate." *Id*.  In determining whether an omission makes a statement misleading, the Supreme Court has directed courts to examine the statement, whether of fact or opinion, "in light of all its surrounding text," "in its full context," and from the perspective of a "reasonable investor." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 190 (2015).

In this case, an examination of FedEx's statements in their full context illustrates the inadequacy of Plaintiff's fraud allegations.  Each of the quarterly reports from which Plaintiff has selected allegedly misleading statements contained language, often bolded and italicized for emphasis, that warned investors about the potentially lingering effects of the June 2017 cyberattack.  For example, six months after that attack, FedEx's December 2017 10-Q report

disclosed that NotPetya's "***ongoing impact could negatively affect our results of operations and financial condition in the future, particularly if our continuing recovery efforts do not proceed as expected.***" Saltzstein Declaration, Exhibit 11 at 50 (emphasis in original).  The July 2018 10-K annual report similarly cautioned that "***[t]he failure to integrate successfully the businesses and operations of FedEx Express and TNT Express in the expected time frame and at the expected cost may adversely affect our future results***."  Saltzstein Declaration, Exhibit 2 at 85 (emphasis in original).  These cautionary statements exemplify Defendants' repeated disclosure of the Company's difficulties in recovering from NotPetya.  In light of those disclosures, the Court concludes that Plaintiffs have failed to allege sufficient facts to establish that FedEx's more optimistic statements misled the investing public.  Even accepting the allegedly omitted facts as true, none of the categories of statements challenged by Plaintiff was actionably false or misleading under the securities laws.

### 1.   Statements Concerning the Operating Income Improvement Target

Plaintiff allege that Defendants lacked a reasonable basis for the various statements that concerned their target of increasing the operating income at FedEx Express by $1.2 billion to $1.5 billion in fiscal year 2020 versus fiscal year 2017.  In their motion to dismiss, Defendants maintain 1) that Plaintiff does not allege sufficient facts to demonstrate that these projections were misleading, and 2) that the challenged representations qualify under the PSLRA's safe harbor protections for certain forward-looking statements or are otherwise unactionable opinions.  The Court agrees that none of the income-target statements are actionable under Section 10(b).

Before FedEx announced to the market in December 2018 that it would not achieve the targeted income increase for the FedEx Express segment by fiscal year 2020, Defendants referenced that target more than a dozen times during the Class Period, consistently adhering to it

in spite of the difficulties caused by NotPetya.  *See* Compl. ¶¶ 53, 56, 61, 70, 72, 73, 82, 87, 92, 99, 104, 109, 111.  The majority of those statements merely expressed the Company's commitment to that target, without making any express assurances about its viability.  *See id.* ¶¶ 53, 56, 70, 73 (affirming or reaffirming "commitment" to improve operating income); *id.* ¶¶ 61, 87, 99 ("targeting operating income improvement"); *id.* ¶ 111 (referencing "the target we've got out there").  The remainder expressly projected FedEx's future performance.  *See id.* ¶ 72 ("Our plans remain on target to improve operating income"); *id* ¶ 104 ("[W]e remain confident we'll reach our goal to improve FedEx Express operating income"); *id.* ¶ 109 ("FedEx Express posted solid revenue growth and is on track to reach our target").

Assuming, without deciding, that the first set of statements is actionable, the Court concludes that Plaintiff has not alleged sufficient facts to demonstrate that any of the above-cited representations were false or misleading when made.  None of the information that Defendants allegedly omitted—the six-month disabling of TNT's international service, TNT's loss of significant amounts of high-margin customers, and the delay in the integration of TNT into FedEx Express—contradicts the Company's continued adherence to a years-long target for the income improvement of the entire FedEx Express segment.  From the beginning, FedEx made clear to the public that the income target was not solely dependent on TNT.  *See* Saltzstein Decl., Exhibit 6 at 5.  Although TNT integration was the "key driver" to the income target, *see* Compl. ¶ 35, the Court cannot reasonably infer that TNT's difficulties following NotPetya were sufficient on their own to render the target unrealistic.  As a result, the Complaint does not adequately allege that the statements were "'untrue' outright."  *See Vivendi*, 838 F.3d at 239.  Indeed, when FedEx announced the revision of is target, the justifications for that revision extended beyond the

performance of TNT, including unfavorable macroeconomic trends in Europe and Asia.  Saltzstein
Declaration, Exhibit 16 at 36, 41.

Nor does the Complaint adequately plead that those statements were misleading by
omission.  In its opposition to the instant motion, Plaintiff insists that the Complaint's allegations
in this regard "stem from Defendants' failure to disclose facts that undercut the income
improvement target," namely that "the Company was experiencing severe problems as a result of
NotPetya."  Pl. Opp. at 24.  To plead falsity on a misleading-by-omission theory, a plaintiff must
allege that that statements "would be misleading without the contextualization of material facts."
*Abramson*, 965 F.3d at 174.  But Courts have long recognized that "'[r]easonable investors
understand that opinions sometimes rest on a weighing of competing facts' and thus that a
statement of opinion does not imply false information to a reasonable investor simply because
there is 'some fact cutting the other way' that the speaker omitted."  *Id.* at 175 (quoting *Omnicare*,
575 U.S. at 189-90).  In this case, the documents incorporated into the Complaint by reference
make clear that Defendants contextualized their professed commitment to the income target with
numerous disclosures about the ongoing effects of NotPetya and the risks inherent in the TNT
integration process.  FedEx publicly acknowledging increased integration expenses and reduced
shipping volumes throughout the Class Period.  The December 2017 quarterly report, for example,
emphasized that the ongoing impact of the cyberattack "***could negatively affect our results of
operations and financial condition in the future, particularly if our continuing recovery efforts
do not proceed as expected.***"  Saltzstein Declaration, Exhibit 11 at 50 (emphasis in original).  The
Company repeatedly provided investors with quantified revenue losses that it attributed to
NotPetya.  *See* Compl. ¶ 37; Saltzstein Declaration, Exhibit 2 at 66, Exhibit 11 at 28, Exhibit 13
at 30.  Defendants' omission of information that may have made the target more difficult to

achieve—*i.e.*, some facts cutting the other way—does not make the statements misleading. As a result, the Court is not persuaded that the alleged failure to disclose additional contrary facts rendered the target statements "misleading to a reasonable person reading the statement fairly and in context." *Omnicare*, 575 U.S. at 194.

The Court similarly concludes that the allegation—derived from the CW—that "there was significant doubt within the Company about its ability to meet the [operating income improvement] target by 2020," Compl. ¶ 42, is insufficient to demonstrate the falsity of the income-improvement statements. This vague and conclusory allegation simply does not demonstrate the falsity of a professed commitment to the target. The Complaint does not specify when during the Class Period the alleged doubt existed, how long that doubt persisted, or who within FedEx harbored that doubt. Nor does it allege that this "significant doubt" was ever shared with, or by, the individual defendants. As a result, the purported doubt does not suffice to plausibly allege that Defendants' statements of commitment to that target were false when made. Moreover, when questioned at oral argument about the underlying circumstances, Plaintiff's counsel responded only that the CW heard of the alleged doubt from his circle of colleagues and contacts within the company. Given that the CW worked as a Senior Business Relationship Manager at TNT's headquarters in the United Kingdom, the allegations do not permit the Court to reasonably attribute the doubt to any of the individual defendants, high-level executives of the American parent company, FedEx.

Even if the Court were to conclude that Plaintiff has alleged facts sufficient to plead the falsity of the income-target statements, they would not be actionable in light of the PSLRA's safe-harbor protections. Pursuant to the PSLRA's safe harbor, a defendant "shall not be liable with respect to any forward-looking statement" if (1) the forward-looking statement is "identified" as such and "accompanied by meaningful cautionary statements," or (2) the forward-looking

statement is "immaterial," or (3) the plaintiff "fails to prove that the forward-looking statement . . . if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading." 15 U.S.C. § 78u-5(c)(1)(A)-(B).  Defendants' statements regarding the income-improvement target plainly fall under the statutory definition of "forward-looking statements" because they concerned "the plans and objectives of management for future operations," "future economic performance," and "a projection of revenues, income ..., [or] earnings." *Id.* § 78u-5(i)(1); *see In re Adient plc Securities Litigation,* No. 18-cv-9116 (RA), 2020 WL 1644018, at *19 (S.D.N.Y. April 20, 2020) (concluding that statements about company being "on track" with respect to its projected margin expansion were "forward-looking" statements within the meaning of the PSLRA).  As the safe harbor is written in the disjunctive, a defendant is not liable if the forward-looking statement is identified and accompanied by meaningful cautionary language *or* is immaterial *or* the plaintiff fails to prove that it was made with actual knowledge that it was false or misleading.  *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 766 (2d Cir. 2010).

Nowhere does the Complaint adequately allege that the individual defendants knew that the statements were false when they made them.  Even if the Court were to infer that the individual defendants were aware of the facts alleged by the CW, it cannot conclude that six months of difficulties at TNT in late 2017 would preclude the achievement of a target set at two years into the future.  To meet the safe harbor's "'actual knowledge' standard for forward-looking statements," which is "stricter than for statements of current fact," a Plaintiff must show "knowing falsity."  *Slayton*, 604 F.3d at 773.  Plaintiff cannot make that showing by relying on the Company's subsequent revision of its target.  As "corporate officials are only responsible for revealing those material facts reasonably available to them . . . . , allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not

22

suffice to make out a claim for securities fraud." *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000). Plaintiff has alleged no facts to demonstrate that Defendants should have revised their target any earlier than they did.

The forward-looking statements about the operative target that can be attributed to the Company, namely those made in press releases and SEC filings, are likewise protected by the safe harbor. Each of those statements was identified as forward-looking and accompanied by the requisite meaningful cautionary language. First, the Company provided boilerplate warnings that "forward-looking statements involve risk and uncertainties" in the cited press releases and SEC filings, *see, e.g.*, Saltzstein Declaration, Exhibit 5, at 53, and at the beginning of its earnings calls, *see, e.g. id.*, Exhibit 9, at 4. More importantly, Defendants' public commitments to the income target were accompanied by numerous disclosures about the risks inherent in the TNT integration process. For example, the July 2018 report specifically cautioned that "***[t]he failure to integrate successfully the businesses and operations of FedEx Express and TNT Express in the expected time frame and at the expected cost may adversely affect our future results***." *Id.*, Exhibit 2 at 85. This warning "convey[ed] substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statement," and thus qualified as a "meaningful cautionary statement" within the meaning of the statutory safe harbor. *Slayton*, 604 F.3d at 771.

### 2. Statements About the Restoration of TNT Operations

Plaintiff alleges that "[w]ithin months of NotPetya, Defendants began to claim falsely that the Company had fully recovered, that its operations were functioning normally, and that it remained on track to expand its business significantly in Europe." Compl. ¶ 2. Defendants respond that the Complaint takes their statements out of context, and fails to acknowledge that

such statements were tempered by disclosures about the significant effect of NotPetya on FedEx and the ongoing nature of recovery efforts.  The Court agrees.

The facts alleged in the Complaint, including those provided by the CW, do not permit the Court to conclude that Defendants' statements concerning its restoration of TNT services following the cyberattack were false when made.  According to the CW, "recovery of the systems disabled by NotPetya took approximately six months to complete," largely disabling TNT's international shipments during that time.  Compl. ¶¶ 40-41.  Accepting the truth of that allegation, however, does not render Defendants' statements misleading, considering the numerous disclosures they made on that subject.  The Company immediately acknowledged NotPetya's effect on international shipments, stating in its June 2017 release that the virus "disrupted" TNT's "operations and communications systems," resulting in delays in "TNT Express inter-continental services." Saltzstein Declaration, Exhibit 7 at 6.

None of Defendants' statements indicated that the systems recovery was completed any earlier than six months after the cyberattack.  The September 2017 quarterly report stated that "*[m]ost* TNT Express services" had resumed and "that *substantially all* TNT Express *critical* operational systems have been restored," although "TNT Express volume, revenue and profit still remain below previous levels." *Id.*, Exhibit 10 at 2 (emphases added).  In a contemporaneous call, Defendant Carter told investors that TNT systems were restored to "*near-normal* state, with *virtually* all *critical* systems up and available."  Compl. ¶ 57 (emphases added).  The carefully hedged language employed by Defendants prevents the Court from inferring that a reasonable investor would conclude that recovery efforts were complete.  *See In re Nokia Oyj (Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d 364, 397 (S.D.N.Y. 2006) ("[C]ourts are instructed to consider the total mix of information and are supposed to bear in mind that disclosure requirements are not

intended to attribute to investors a child-like simplicity." (internal quotation marks omitted)).  The fact that the Company did not report that "*[a]ll* of TNT Express's critical operational systems have now been fully restored" until December 2017, *see* Saltzstein Declaration, Exhibit 11 at 28 (emphasis added), is entirely consistent with the CW's six-month timeline.  Likewise, the Company's representations that "substantially all TNT Express services were fully restored during the first quarter of 2018," *see* Compl. ¶¶ 86, 88, 98-99, accords with the CW's allegations that the effective disabling of international shipments lasted only six months.

Moreover, as described above, statements about the process of recovery were made alongside numerous disclosures about the ongoing efforts of the recovery.  During the Class Period, the Company continually advised investors of the risk that recovery from NotPetya would delay the planned integration.  Although Section 10(b) obligated the Company to be complete and accurate in its representations, it did not require Defendants to project a pessimistic outlook on the degree to which TNT's services had been disrupted.  *See Novak*, 216 F.3d at 309 ("[A]s long as the public statements are consistent with reasonably available data, corporate officials need not present an overly gloomy or cautious picture of current performance and future prospects.").  Considering FedEx's numerous disclosures about the recovery process, the Court cannot conclude that its statements would be misleading to a reasonable investor "in light of the circumstances under which they were made," 17 C.F.R. § 240.10b-5(b).

### 3.    Statements About the Retention of TNT's Customer Base

The Complaint further alleges that FedEx failed to disclose "an unfavorable turn in its 'service mix'" – a euphemism for losing high-margin business because customers fled to competitors as FedEx's European operations floundered in NotPetya's aftermath."  Compl. ¶ 8.  Plaintiff specifically contends that FedEx concealed the fact "that approximately 10% of the

Company's high-margin business (customers that generated between a 10% and 13% margin for TNT) abandoned TNT in favor of competitors," and that this abandonment significantly impacted TNT's sales.  Compl. ¶ 41.  Defendants maintain that this theory of concealment is "belied by the Company's actual disclosures on multiple grounds."  Mot. at 17.  Viewing Defendants' representations "together and in context," *see Meyer*, 761 F.3d at 531, the Court agrees.

Throughout the Class Period, FedEx disclosed the losses to its customer base and shipping volumes caused by NotPetya, as well as its ongoing efforts to mitigate those losses.  For example, the Company's December 2017 quarterly report—filed nearly six months after the attack—stated that "not all customers are shipping at pre-attack levels," and that average international volumes were offset "by the decrease in volume due to the NotPetya cyberattack."  Saltzstein Declaration, Exhibit 11 at 28, 39.  FedEx's March 2018 report likewise announced that the $400 million estimated negative impact of the cyberattack was "primarily from loss of revenue due *to decreased shipments in the TNT Express network*."  *Id.*, Exhibit 13 at 30 (emphasis added).  The September 2018 report added that that "changes in *service mix* following the NotPetya cyberattack negatively impacted operating margin[s]," *Id.*, Exhibit 15 at 37 (emphasis added).  In light of these numerous disclosures, the Court cannot credit the allegation that FedEx concealed the negative impact of the NotPetya attack on the TNT customer base.

Nor does the Complaint allege that Defendants made any statement that contradicted the CW's allegations that TNT had lost 10% of its high-margin business.  Because the "CW is silent as to *when* these alleged customer defections occurred or if the customers returned once the clearance system was restored," Mot. at 19 (emphasis in original), the allegations in the Complaint are insufficient to demonstrate that FedEx misled investors with its more optimistic statements on this topic.  Bronczek's September 2017 statement that existing infrastructure networks had allowed

the Company to "retain a *significant portion* of [the] TNT customer base" during the recovery, *see* Compl. ¶ 59 (emphasis added), is not inconsistent with the figure cited by the CW. Nor is the September 2017 statement that international export yields increased 2% in the first quarter of 2018 due in part "to favorable service mix," Compl. ¶ 63. Plaintiff fails to provide specific facts to support its contention that a 10% loss of a specific type of customer from one part of the business segment prevented FedEx from making a general description of its service mix as "favorable." The Court reaches the same conclusion about the Company's statements that TNT was experiencing "strong service levels." *See id.* ¶¶ 60, 74, 83.

Because Plaintiff can point to no other specific statement to support their allegation that the information FedEx "provided to the market did not comport with the risks that Defendants knew" with respect to the retention of TNT customers, Opp. at 14, Plaintiff's allegations are insufficient to state a claim for fraud.

### 4. Statements Concerning the Process of Integration

Lastly, the Complaint alleges that Defendants falsely represented that the timetable for completing the TNT integration would be "accelerated in light of the June 2017 cyberattack at TNT Express, and that the Company was on track to meet its integration goals." Compl. ¶ 7 (internal quotation marks and emphasis omitted). Plaintiff avers that those statements contradicted the reality that the integration was substantially delayed and "not completed in time because of NotPetya." *See* Compl. ¶ 40. Defendants argue that Plaintiff's claims are "rooted in a distortion of what was actually communicated to investors," Mot. at 20, and that the Company's repeated disclosures of integration difficulties counter any allegations of falsity. Once again, the Court agrees.

As an initial matter, Plaintiff's allegations about "acceleration" appear to conflate the Company's efforts to integrate TNT with the progress of that integration. The Complaint alleges no facts to support that claim that FedEx represented that NotPetya had somehow "accelerated[] the integration of TNT into FedEx Express." *See* Compl. ¶¶ 63, 78, 89, 95, 100, 107, 110, 113. The Court cannot conclude that a reasonable investor would have gleaned that impression from Defendants' statements, even the ones highlighted by Plaintiff. For example, the Company stated in September 2017 that "[i]ntegration *efforts* [would] be expedited" in the wake of NotPetya. *Id.* ¶ 58 (emphasis added). Accompanying that statement was a warning that the acceleration would possibly result in "an increase in integration spending on technology," Saltzstein Declaration, Exhibit 9 at 6. In December 2017, the Company similarly disclosed that it was "accelerating the integration *process* and increasing [IT and infrastructure] due to the recent cyberattack at TNT Express," which would result in a $600 million increase in integration costs. Compl. ¶ 69 (emphasis added). The Court cannot reasonably infer, as Plaintiff appears to imply, that an investor would mistakenly conclude from these statements that a cyberattack had helped integration efforts.

The Complaint also fails to adequately plead the falsity of statements in which Defendants touted the progress of integration. *See, e.g., id.* ¶ 83 ("I'm happy to say that at TNT, we are seeing strong service levels and the integration is accelerating"). Regardless of its consistency with CW's allegations regarding the NotPetya attack, such a statement is inactionable "puffery." The same is true of Defendant Subramiam's September 2018 statement to investors that "we are progressing well on the integration, and customers are already beginning to see the value." *Id.* ¶ 105. "A statement of 'puffery,' i.e. 'an optimistic statement that is so vague, broad, and non-specific that a reasonable investor would not rely on it,' is not actionable." *In re Adient,* 2020 WL 1644018, at *21 (quoting *Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 297-98 (S.D.N.Y. 2018)).

The Complaint alleges no fact that would render fraudulent such broad statements of optimism. *See Novak,* 216 F.3d at 309 ("[C]orporate officials need not present an overly gloomy or cautious picture of current performance . . .").

Plaintiff also alleges the falsity of the March 2018 statement that the "integration" of FedEx and TNT's "global sales force," was scheduled for completion a year earlier than expected. Compl. ¶ 84.  Because the Complaint is devoid of any factual allegations about the integration of the sales force,  Plaintiff has failed to state a claim of falsity with regard to that statement.

Furthermore, FedEx's warnings of continually increasing integration expenses at every juncture during the Class Period belie any claim of concealment.  *See* Saltzstein Declaration, Exhibit 9 at 6 (September 2017 earnings call); *id*., Exhibit 11 at 50 (December 2017 quarterly report); *id.,* Exhibit 13 at 4 (March 2018 quarterly report); Compl. ¶ 90 (June 2018 quarterly report); Saltzstein Declaration, Exhibit 2 at 85 (July 2018 annual report); *id.*, Exhibit 15 at 37 (September 2018 quarterly report).  Given those numerous disclosures, which normally included precise quantified figures about the increased expense, the Court is unable to credit Plaintiff's claim that FedEx concealed the delays in TNT integration resulting from the cyberattack.  *See Olkey v. Hyperion 1999 Term Trust, Inc.,* 98 F.3d 2, 5 (2d Cir. 1996) (finding failure to state a claim where challenged representations "warn[ed] investors of exactly the risk the plaintiffs claim was not disclosed").  Viewing Defendants' representations "together and in context," *see Meyer*, 761 F.3d at 531, "in light of the circumstances under which they were made," 17 C.F.R. § 240.10b-5(b), the Court finds such a claim unreasonable.

### B.     Whether Plaintiff Adequately Pleaded Scienter

To state a claim under Section 10(b), Plaintiff must also adequately allege that each Defendant acted with scienter when making the allegedly false or misleading representations.

29

"[P]laintiffs must state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Novak*, 216 F.3d at 315 (internal quotation marks omitted). Where the defendant is a corporation like FedEx, a plaintiff must allege "that an agent of the corporation committed a culpable act with the requisite scienter, and that the act (and accompanying mental state) are attributable to" the entity. *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008) (citation omitted). A complaint will survive a motion to dismiss "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 324 (2007).

"[T]he scienter requirement is met where the complaint alleges facts showing either: 1) a motive and opportunity to commit the fraud; or 2) strong circumstantial evidence of conscious misbehavior or recklessness." *Emps. Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015) (internal quotation marks omitted). To adequately plead motive and opportunity, a plaintiff must allege that the defendant "benefitted in some concrete and personal way from the purported fraud." *Novak*, 216 F.3d at 307-08. "Motives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute 'motive' for purposes of this inquiry." *ECA, Local 134 IBEW Joint Pension Tr.*, 553 F.3d at 198.

Absent a showing of motive, however, "'the strength of the [plaintiff's] circumstantial allegations must be correspondingly greater.'" *Id*. at 199 (quoting *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001)). An inference of conscious misbehavior or recklessness arises where the complaint sufficiently alleges that the defendants "knew facts or had access to information suggesting that their public statements were not accurate" or "failed to check information they had

30

a duty to monitor." *Novak*, 216 F.3d at 311.   The evidence must create the inference that "defendants engaged in conscious misstatements with the intent to deceive." *Id.* at 312.

Plaintiff's conclusory allegations of scienter do not meet this standard.   The Complaint is devoid of any allegations that the individual defendants acted with any motive, whether pecuniary or otherwise, to deceive the investing public.   Instead, it claims, without additional factual support, that Defendants "were active and culpable participants in the fraudulent scheme," and that they authorized the Company's "misstatements" despite possessing "information reflecting the true facts regarding FedEx."   Compl. ¶ 138.   Plaintiff does not specify what "true facts" Defendants received, nor how or when they received such facts.   The CW does not implicate any of the individual defendants, nor allege any facts to demonstrate that they had knowledge that would contradict, let alone undercut, the Company's public statements.   Instead, the Complaint broadly states that they had access to relevant non-public information about the Company's operations "[b]ecause of their positions within FedEx," *id.* ¶ 139, "their high-level positions within the Company," *id.* ¶ 140, and "their positions of control and authority as officers and/or directors of the Company," *id.* ¶ 141.   The CW adds that unnamed "FedEx Senior Vice Presidents and Vice Presidents traveled to Amsterdam" to participate in briefings with TNT on IT issues.   *Id.* ¶ 147.

The Court finds those allegations too speculative to raise an inference that the individual defendants knew or falsely disregarded facts that contradicted their statements.   Courts within the Second Circuit have dismissed claims of securities fraud where, as here, plaintiffs failed to allege with particularity that defendants had access to information that suggested the inaccuracy of their public statements.   *See, e.g., Schwab v. E\*Trade Fin. Corp.*, 285 F. Supp. 3d 745, 757 (S.D.N.Y.), *aff'd*, 752 F. App'x 56 (2d Cir. 2018) ("[B]oilerplate allegations that defendants knew or should have known of fraudulent conduct based solely on their board membership or executive

positions are insufficient to plead scienter."); *Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Exp. Co.*, 724 F. Supp. 2d 447, 462 (S.D.N.Y. 2010), *aff'd sub nom., Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Express Co.*, 430 F. App'x 63 (2d Cir. 2011) (holding that "assertions that certain information was the 'sort of measurement' or 'would have been' reviewed by the Individual Defendants are too speculative to give rise to a strong inference of scienter"); *cf. In re Avon Sec. Litig.*, No. 19 CIV. 01420 (CM), 2019 WL 6115349, at *1 (S.D.N.Y. Nov. 18, 2019) (finding scienter adequately pled where multiple confidential witnesses specifically alleged that defendants received "daily updates" and "monthly forecasts" with facts that would suggest their public statements were inaccurate).

The Court accordingly concludes that Plaintiff has not alleged sufficient facts to raise a strong inference of scienter. Plaintiff's failure to adequately plead scienter provides an alternate basis for dismissal of its claims under Section 10(b).

## II.   Whether Defendants Violated Section 20(a) of the Securities Exchange Act

Plaintiff further alleges that the individual defendants should be held separately liable as "control persons" under Section 20(a) of the Exchange Act.

Section 20(a) of the Exchange Act provides that

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable ..., unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).

Liability under Section 20(a) is derivative. "In order to establish a prima facie case of controlling-person liability, a plaintiff must show a primary violation by the controlled person and control of the primary violator by the targeted defendant, and show that the controlling person was

32

in some meaningful sense a culpable participant in the fraud perpetrated by the controlled person." *S.E.C. v. First Jersey Sec., Inc.,* 101 F.3d 1450, 1472 (2d Cir. 1996) (internal quotation marks, brackets, and citations omitted); *accord Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 139 (2d Cir. 2011).

Because Plaintiff has failed to make a prima facie case of a "primary violation" under Section 10(b), it has not sufficiently pleaded that Defendants violated Section 20(a).  Accordingly, those claims are dismissed.

## III.   Whether Defendants Violated Item 303

Lastly, Plaintiff claims that FedEx violated Item 303 of Regulation S-K by failing to disclose, in its SEC filings during the Class Period, the fact that "TNT's operations were effectively disabled in the wake of NotPetya, which caused and would continue to cause a material reduction in TNT's high-margin customers, revenue, and growth."  Compl. ¶¶ 51-52.  Item 303 requires a company to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  17 C.F.R. § 229.303(a)(3)(ii).

Even if the Court were to assume that FedEx's disclosures about the negative impact of NotPetya were somehow insufficient, Plaintiff's Item 303 claim would still fail on the ground that the Complaint does not adequately plead scienter.  "For Defendants' breach of their Item 303 duty to be actionable under Section 10(b), Plaintiff[] w[as] required adequately to plead each element of a 10b–5 securities fraud claim."  *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 106 (2d Cir. 2015) (affirming dismissal of Item 303 claim on the basis that complaint did not give rise to a strong inference of scienter).  The failure to plead scienter mandates dismissal of Plaintiff's claim under Item 303.

**IV.     Whether Plaintiff Should Be Granted Leave to Amend**

Plaintiff requests leave to amend the Complaint in the event the Court dismisses the action for failure to state a claim.  Opp. at 35 n.21.  Pursuant to Fed. R. Civ. P. 5(a)(2), a court should freely grant leave to amend "when justice so requires."  However, "[l]eave to amend may properly be denied if the amendment would be futile."  *Anderson News, L.L.C. v. Am. Media, Inc*., 680 F.3d 162, 185 (2d Cir. 2012).   In this case, the Court concludes that amendment would be futile.  When pressed at oral argument as to what amendments would be made to the Complaint were the Court to adopt Defendants' arguments for dismissal, Plaintiff's counsel responded only in vague terms about the possibility of clarifying or adding details to the allegations that would not change the outcome.

Absent the addition of new facts that would contradict Defendants' public statements, Plaintiff cannot establish that the four categories of statements were false within the meaning of the securities laws.  When assessed alongside FedEx's numerous and continuous disclosures about NotPetya, it is not plausible that the statements in question were misleading to a reasonable investor.  Leave to amend is therefore denied as futile.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss Plaintiff's complaint is GRANTED with prejudice.  The Clerk of Court is respectfully directed to terminate item 80 on the docket and close this case.

SO ORDERED.

Dated:          February 4, 2021
                    New York, New York

_____
Ronnie Abrams
United States District Judge